Agnes, A.J.
The defendant is charged in five indictments with trafficking in cocaine, a class B controlled substance, trafficking within a school zone, possession with intent to distribute phencyclidine, a class B controlled substance, possession with intent to distribute a class B substance within a school zone, and possession of marijuana, a class D controlled substance. The defendant has filed a pretrial motion to suppress evidence seized as a result of a search warrant. Based on the credible evidence presented at the pretrial motion to suppress, I make the following findings of fact and rulings of law.
FINDINGS OF FACT
On or about December 8, 2001, officer Stephen Withrow and officer Timothy Donovan of the Lynn Police Department interviewed Ms. Sonja Baldwin who reported that her boyfriend, Parisse Odom, had physically assaulted her and threatened to kill her. In particular, she told the police that 2 days earlier, on December 6, 2001, she was at Odom’s apartment at 25 Atkinson Street in Lynn, Massachusetts. They had an argument. Odom pointed a .45 caliber handgun at her and threatened to kill her. Ms. Baldwin told the police that Odom lived in a second floor bedroom off the kitchen at that address. Entry was accomplished from a rear staircase. She added that he kept the handgun in the bedroom closet or in a black bag in his motor vehicle (described as a 1990 Volkswagen Jetta, color brown, Mass. Reg. 139550). She also told the police that she had seen the handgun on other occasions in his apartment and on his person.
Ms. Baldwin further stated that on December 8, 2001, Odom confronted her shortly after noontime as she walked to her vehicle and tried to force her to get into his vehicle. He accused her of cheating on him. Ms. Baldwin was with her two young children at the time. She was able to secure her two children by putting them into her automobile and then told Odom to leave. He grabbed her by her hair, threatened her, and tried to pull her into his vehicle. Odom actually pulled a tuft of her hair out of her scalp.
Based on this information, the police obtained a search warrant for “25 Atkinson Street-Bedroom off of the kitchen on the second floor.”[1] In the application for the warrant, the police described the building as follows: “25 Atkinson Street-yellow three stoiy with brown shutters, number 25 in large brass numerals to right of front door.” The police also requested and obtained authority to search and seize Odom if found on the premises.
The police executed this search warrant at approximately 3:30 p.m. The police found the rear door to the building unlocked and made their entry through that door. When they arrived at the second floor they knocked and announced their presence by shouting, “Police, we have a search warrant.” There was no response. The apartment door was locked. The police went around to the front door and repeated the same procedure. There was no response. That door was also locked. They forced open the door and entered the second floor apartment.
In keeping with standard police procedure, the police inspected the various rooms on the second floor to determine if anyone was present who might be a danger, who might interfere with the execution of the warrant or who might be in distress. They entered through the living room and found a door leading to another room was locked. The kitchen was located at the rear of the apartment. A door led from the kitchen to another room and that too was locked. The police also found a stairway that led to the third floor where there were two empty rooms.
Believing that the room off of the kitchen was the room belonging to Odom, the police forced open the door. Almost simultaneously, other officers executing the warrant heard a television set or radio on in the second locked room off of the living room. That door also was forced open. Inside the room on a table next to the bed the police observed several aluminum folds or wrappers associated with narcotic packaging, a rolled dollar bill and a box of cigarette rolling papers and a marijuana cigarette. The police also observed a open bag with a Walgreen’s logo on it containing a large quantify of white pills. The contents of the bag were visible to the police. Each pill had numbers stamped on it. A digital scale was also in plain view on a television stand inside the bedroom
The police did not move any objects or search the second locked room any further, but instead used the information to prepare an application for a second search warrant. As a result of the execution of a second search warrant, a large quantify of drugs and other incriminating evidence was seized leading to the charges against the defendant.
DISCUSSION
The defendant maintains that the observations made by the police when they entered the second locked room and all the evidence seized as a result of the second warrant must be suppressed because they exceeded the scope of the original search warrant, and, *434 in effect, conducted a warrantless search of the defendant’s room.
1. The police werejustified in forcing open the second locked door as a protective sweep incident to the execution of the search warrant. The warrant in this case authorized the police to search a particular location namely, the bedroom off of the kitchen on the second floor of 25 Atkinson Street in Lynn.[2] Even if it is assumed that the warrant authorized only a search of that particular room within the second floor apartment,[3] the police may be authorized to inspect adjacent areas in order to protect themselves and others who may be present from harm. ‘The Fourth Amendment permits a quick and limited search of premises, incident to an arrest[, when] conducted to protect the safety of police officers and others. Maryland v. Buie, 494 U.S. 325, 327 (1990). The searching officers, however, must possess a reasonable belief based on ’’specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing, that the area swept harbored an individual posing a danger to the officer or others." Commonwealth v. Dubois, 44 Mass.App.Ct. 294, 296 (1998), quoting Maryland v. Buie, 494 U.S. 325, 327 (1990).[4]
The so-called “protective sweep” doctrine of Maryland v. Buie, supra, has been applied in several Massachusetts cases to approve of prompt warrantless searches incident to the defendant’s arrest inside a dwelling. See Commonwealth v. Lewin (No. 1), 407 Mass. 617, 622-27 (1990) (discussing the scope of the “protective sweep” doctrine in the context of a murder case, and concluding that it authorized the police to make a prompt warrantless search of the crime scene to see if there are other victims or if a killer is still on the premises, but did not authorize the police to call experts back to the scene, without a warrant, to look for secret hiding places where drugs could be stored); Commonwealth v. Bowden, 379 Mass. 472, 478 (1979) (pre-Buie case in which, following an arrest in a case involving firearms, police were permitted to conduct a security check of the basement to determine if other armed individuals were about); Commonwealth v. Allen, 28 Mass.App.Ct. 589, 594 (1990) (applying the “protective sweep" doctrine to authorize the police, incident to the arrest of the defendant on a warrant, to conduct a limited search of the premises to secure themselves against harm from other persons who might be in the apartment). The doctrine is grounded in the necessity for the police to take reasonable measures to insure their personal safety, and is not a license to conduct a warrantless search or inspection of a dwelling incident to an arrest.
Although the protective sweep doctrine has been applied exclusively in arrest situations, there is no reason why it should not apply in the circumstances of this case involving the execution of a search warrant for a firearm. See generally 2 W. R. LaFave, SEARCH AND SEIZURE §4.10 658-59 (3rd ed. 1996 & Sup. 2003). This is precisely the reasoning of the Court of the Appeals for the First Circuit in United States v. Daoust, 916 F.2d 757, 759 (1990). In Daoust, the First Circuit held that under the authority of Maryland v. Buie, supra, the police executing a search warrant for a rifle that previously was observed from outside the home to be in plain view inside the kitchen were authorized to conduct a “thirty second ‘protective sweep’ of several rooms inside the home.” The court reasoned that the police had an objective basis to be concerned for their own safety based on the items called for in the warrant and the defendant’s prior criminal history of violent behavior.
In the present case, the police officers executing the search warrant for Mr. Odom’s firearm had ample reason to be concerned for their own safely. Ms. Baldwin told the police that the defendant had assaulted her in a jealous rage and threatened to kill her. When they executed the warrant, they had no specific knowledge of Mr. Odom’s whereabouts and reason to believe that someone might be inside the other locked room. Cases such as Maryland v. Buie, supra, and United States v. Daoust, supra, are entirely consistent with earlier Massachusetts precedent that provides that when the police conduct a search of premises pursuant to a warrant, they have the right to take reasonable measures for their own protection and the protection of others on the premises. Commonwealth v. Bowden, 379 Mass. 472, 478 (1979), citing Commonwealth v. Walker, 370 Mass. 548, 556, cert. denied, 429 U.S. 943 (1976) (‘This court has recognized that, subsequent to an arrest, a security check of other rooms in a dwelling is valid in the interest of insuring the safety of the police”). Cf. Commonwealth v. Garner, 423 Mass. 735, 740 (1996) (“Nothing in the language of the Constitution or in this Court’s decisions interpreting that language suggests that. . . search warrants also must include a specification of the precise manner in which they are to be executed. On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant-subject of course to the general Fourth Amendment protection ‘against unreasonable searches and seizures’ ” (quotation omitted)).
Here, the police were faced with a situation that demanded immediate action. They were armed with a warrant that called for the search and seizure of Mr. Odom and that was based on facts indicating that Odom’s gun had been seen in places within the apartment other than his bedroom. They discovered only after entering the premises a room other than the one specified in the warirant which was locked, but in which someone had turned on a television or radio. What if Odom was hiding in that room? If the police had failed to enter that room, it would have been a dereliction of their duty.
*435 The discovery of the locked room with a television or radio playing was an exigency that required the police to force open the door and conduct an inspection of the room even if in doing so they exceeded the scope of the warrant. “Regardless of how finely the law of search and seizure is parsed and labeled, the ultimate touchstone of art. 14 and the Fourth Amendment is whether a search or seizure was reasonable in the circumstances. The officers were entitled to act to insure their safety, the safety of others in the apartment, and the public. The search did not exceed the scope justified by the exigency ...” Commonwealth v. Moore, 54 Mass.App.Ct. 334, 340 (2002).
2. The police did not exceed the scope of a valid protective sweep. Once the police entered the defendant’s bedroom, they made observations of items in plain view that were indicative of the presence of illegal drugs. They did not open closed containers, or sort through personal belongings and papers. The acted promptly and secured the room after making the initial observations. Contrast, Commonwealth v. Cruz, 53 Mass.App.Ct. 24 (2001) (police exceeded the scope of the protective sweep doctrine by calling a group of experts back to the scene to conduct a warrantless inspection of suspected telephone cloning devices); Commonwealth v. Nova, 50 Mass.App.Ct. 633 (2000) (no justification for a protective sweep following the defendant’s arrest because there was no reason to believe that anyone else was on the premises).
Because the police had a right to enter the room and their discovery of the existence of illegal drugs was inadvertent, the plain view exception would have authorized them to seize the items without a warrant. Commonwealth v. D’Amour, 428 Mass. 725, 730-32 (1999) (Police had a right to scan a letter found at the defendant’s home under the terms of a warrant that authorized them to search for writings relating to the ownership of firearms. Once the police looked at it they were entitled to seize it under the plain view doctrine because it suggested a motive for the crime under investigation; in so holding, court observes that under Massachusetts law, the discovery must have been inadvertent). See also Commonwealth v. Wilson, 427 Mass. 336 (1998); Commonwealth v. Santana, 420 Mass. 205, 211 (1995). Here, however, out of an abundance of caution, the police sought and obtained a second search warrant.
ORDER
For the above reasons, the defendant’s pretrial motion to suppress is DENIED.

The applications for the first and second search warrants along with the warrants themselves and the returns are attached to the defendant’s Memorandum of Law and were made part of the record in this case.

This is not a case in which it was evident that the police were dealing with a multi-occupancy apartment. The police had no knowledge that more than one resident occupied the second floor or that there were multiple bedrooms on that floor. There was nothing about the appearance of the building from the outside that would have alerted the police to the existence of more than one resident on the second floor. See Commonwealth v. Burt 393 Mass. 703, 718 (1985) (in a case upholding a search pursuant to a warrant of a home that turned out to be a two-family , the court observed “(b)ecause the building had all the appearances of a single-family dwelling, and because the police officers were not otherwise put on notice, there was no reason for them to so inquire”).

The warrant authorized the police to not only search Odom’s room, but to search and seize Odom’s person. Furthermore, the information supplied by Ms. Baldwin indicated that she had seen the gun in the defendant’s bedroom and in other locations in the apartment. How could the police know that Odom did not have use of the second locked room for storage? See Commonwealth v. Germain, 396 Mass. 413, 418 (1985) (“An affidavit for a search warrant also must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion . . . [T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants” (quotation omitted)). The public policy that favors reading warrants in a commonsense and not hypertechnical fashion, see Commonwealth v. Atchue, 393 Mass. 343, 345-49 (1982), supports the view that the warrant should be understood to authorize the search of the entire second floor apartment including the second, locked bedroom in order to locate Odom as well as the firearm. Compare Commonwealth v. Scala, 380 Mass. 500, 508-09 (1980).

The defendant has not argued that Article 14 of the Massachusetts Declaration of Rights should be interpreted more strictly than the Fourth Amendment in this context.